[Civil No. 2976.   Filed June 6, 1930.]

[288 Pac. 1034.]

ED OGLESBY, as Tax Assessor in and for Maricopa County, Arizona, Defendant-Appellant, ARTHUR C. LUHRS and I. E. BROWN, Interveners-Appellants, v. A. J. CHANDLER and ARTHUR E. PRICE, in Their Own Behalf and in Behalf of Others Similarly Situated, Plaintiffs-Appellees.

Mr. Henry J. Sullivan, Mr. William C. Eliot and Mr. Austin O'Brien, for Appellant Oglesby.

Messrs. Struckmeyer & Jennings, for Appellant Luhrs.

Mr. I. J. Lipsohn, for Appellant Brown.

Mr. Frank W. Beer, Messrs. Kibbey, Bennett, Gust, Smith & Rosenfeld, Messrs. Alexander, Silverthorne & Van Spanckeren, Mr. M. J. Dougherty and Mr. G. A. Rodgers, for Appellees.

LOCKWOOD, C. J.—This is an appeal from a judgment of the superior court of Maricopa county enjoining Ed Oglesby as tax assessor from extending upon the tax-roll of said county those certain tax valuations and assessments upon the taxable property of the county transmitted to him by the Board of Tax Survey.

Because of the extreme importance of an early determination of the issues involved in this case, affecting as they do the validity of the tax assessments of the fourteen counties of the state for the year 1930, this court has set aside its usual method of procedure so far as possible in order that the issues be presented and adjudicated with the greatest promptness consistent with accuracy. For the same reason, instead of confining ourselves in this opinion to a consideration of the questions absolutely essential to a determination of the specific issues presented on the record, we shall go further than is our custom in suggesting the correct solution of matters which may necessarily arise as a result of our decision.

The ninth legislature of the state of Arizona enacted chapter 46 of the Session Laws of 1929, commonly known as House Bill 127, and by which name we shall refer to it hereinafter. The first eight sections of the bill affect the assessment of the state, the remaining portion dealing with the collection of delinquent taxes. It is with the part referring to the assessment, and that alone, that this case is concerned; and, the two matters being separable, we need not consider for any purpose that part providing for the collection of delinquent taxes. The bill, so far as is material to the consideration of this case, reads as follows:

"Section 1. There is hereby created a permanent state board to be known as the Board of Tax Survey, the same to consist of three members, each of whom

shall receive an annual salary of fifteen hundred dollars to be paid out of the State Treasury as the salaries of other state officers are paid.

"The Board shall take office immediately upon this act becoming effective and shall immediately proceed to institute a scientific survey of all taxable property and classes of property throughout the State, including all taxable property and classes of property situate or found in any city, town, or other municipal corporation or legal subdivision of the State. The survey shall be made for the purpose of (a) placing upon the tax rolls in every county of the State, all property of every kind and character, subject to taxation under existing provisions of law; (b) extending on the tax rolls in every county of the State with respect to all taxable property and classes of property the valuation for tax purposes as now required by law.

"Section 2. The first survey to be made by the Board shall be completed on or before the first day of January, 1930. During each five year period succeeding the first day of January, 1930, the Board shall conduct a new survey of all taxable property and classes of property in the State and the property and the valuations found shall be placed and extended upon the tax rolls as hereinafter provided. The procedure established for the survey to be completed January 1st, 1930, shall govern subsequent surveys made by the Board.

"Section 3. Immediately upon taking office, the Board shall employ a qualified person to conduct said survey provided that supervision of the survey shall always be exercised by the Board. The Board shall meet at least every sixty days during the time said survey is in progress with the person conducting the same for the purpose of directing the survey and securing information as to the nature and progress of the survey. The deliberations of the Board and the information secured in connection with the survey shall not constitute a public record, but shall remain in the private files of the Board until the results of said survey shall be communicated to the several county assessors of the State as hereinafter provided.

"Section 4. On or before the first day of May, 1930, the Board shall transmit to the several county assessors of the State, all tax valuations found by it upon specific property or classes of property, and prior to the date fixed by law for the filing of the assessment rolls with the Clerk of the Board of Supervisors, the assessors in each county shall extend upon the assessment rolls the valuations as found and transmitted by the Board of Tax Survey. The valuation so found and transmitted by the Board shall supersede any valuations theretofore found by said assessors or extended upon the assessment rolls.

"In the event the Board shall find that any property subject to taxation as provided by law is not set forth on the assessment roll of the county in which said property is situate or found, then a description of said property shall be transmitted to the county assessor of the county in which said property is situate or found, and said county assessor shall include said property upon the assessment roll as decribed by the Board and at the valuation fixed by the Board.

"The taxability of, or the valuation of any property or classes of property found by the Board, may be reviewed before the county board of equalization, the state board of equalization, and in the courts in the same manner and to the same extent as now provided by law, where the taxability or valuation of property or classes of property is fixed by the county assessor.

"Section 5. In the event that any property found to be taxable by the Board of Tax Survey shall be stricken from the rolls by the County Board of Equalization as not subject to taxation, or in the event the valuation found by the Board of Tax Survey shall be modified by the County Board of Equalization, then the clerk of the County Board of Equalization in transmitting an abstract of assessment roll to the State Board of Equalization, as required by law, shall endorse upon said abstract of the assessment roll a notation indicating the property or valuation as fixed by the Board of Tax Survey, and the State Board of Equalization shall restore said property so stricken or said valuation so modified to the assessment roll unless in the judgment of the

State Board of Equalization the inclusion of such property or such valuation upon the assessment roll is clearly erroneous and not according to law.

"Section 6. The Board shall have the right in its discretion to employ a tax valuation expert to act as assistant to such person as the Board shall put in charge of the survey; and to employ such stenographic and clerical assistance as shall be required to carry out the provisions of this act.

"The Board in its discretion shall have the right acting through any or all of its members or through any agent or employee designated for the purpose, to examine all property subject to taxation in the State; to hold hearings at any places in the State as to the taxability or value for tax purposes of any property or classes of property; to require the attendance of witnesses and to administer oaths; to require the production of documents or other writings; to secure from any taxpayer, individual or corporation, a sworn statement as to the nature, amount, value, and situs of the property subject to taxation in which such taxpayer may have any interest.

"Section 7. The members of the State Tax Commission as at present or hereafter composed, shall constitute the Board of Tax Survey. The legislature adopting this act hereby declares that the jurisdiction, authority, and duties vested in and imposed upon the Board of Tax Survey are intended to be independent of and in addition to the jurisdiction, authority, and duties in this act vested in and imposed upon the State Tax Commission and the State Board of Equalization. The legislature adopting this act hereby declares that the provisions hereof relating to the duties of the Board of Tax Survey, County Assessors, County Boards of Equalization, the State Board of Equalization and taxpayers, except where discretionary authority is herein specifically provided, are mandatory. . . .

"Section 8. The sum of thirty thousand dollars or so much thereof as may be necessary, is hereby appropriated out of any money in the State Treasury not otherwise appropriated for the purpose of carrying out the provisions of this act relating to the Board of Tax Survey, its jurisdiction, authority, and duties."

The bill passed the lower House by a vote of forty-five to three, and the Senate without a dissenting vote, and was duly approved by the Governor.

In the early part of May, 1930, A. J. Chandler and Arthur E. Price, hereinafter called plaintiffs, in their own behalf and on behalf of others similarly situated, brought suit against Ed Oglesby as tax assessor in and for Maricopa county, hereinafter called defendant. The amended complaint on which the case was determined is voluminous, and we summarize it, except where an exact quotation therefrom seems advisable. After stating that plaintiffs are the owners of taxable property in Maricopa county, it gives the substance of the material provisions of House Bill 127, and that part of chapter 75, Revised Code of 1928 (sections 3056–3192), which refers to the duties of county assessors in regard to preparing the assessment-rolls of their respective counties, and states defendant has completed his assessment-roll in compliance with said chapter 75. It then alleges that the board of tax survey created by House Bill 127, which we shall hereinafter call the board, "did not perform the duties imposed upon it by the said House Bill Number 127 to be performed with reference to the first survey to be made by said board, and to be completed on or before the first day of January, 1930; that said Survey Board did not make a scientific survey, nor any survey, of all the taxable property of the state before the first day of January, 1930, nor at all up to the present time; that said Survey Board made no attempt to make any valuations whatever of the property of producing mines, railroads, and public service corporations, within the State of Arizona, or within the County of Maricopa; that said Survey Board made no attempt whatever to make any valuation of any personal property whatsoever in Maricopa County, nor of improvements

made on lands in Maricopa County, after the assessment roll for the year 1929 was prepared and completed; . . . '' and in substance that it arrived at the valuation of the property which it did survey in an arbitrary manner and by means of guesses based on the general knowledge of the board and its employees. It then, after much immaterial matter, claims that ''said Survey Board did not complete its said purported survey before the first day of January, 1930, nor at all, but on or about the 6th day of February, transmitted to the defendant as Tax Assessor of Maricopa County, a certain partial list of its alleged valuations arrived at as aforesaid, and required said defendant to accept same as superseding valuations theretofore made by him, and to extend the same upon the assessment-roll of Maricopa County, and that said Survey Board between said 6th day of February, 1930, up to and including the first day of May, 1930, did transmit piecemeal at various times and in various amounts, further partial lists of alleged valuations arrived at by it, and required said defendant as County Assessor to accept such alleged valuations as superseding the valuations theretofore made by him, and to extend the same upon the tax roll of Maricopa County''; that many other variances from the requirements of House Bill 127 were made by the board, and that, ''by reason of the failure of said Tax Survey Board to substantially comply with the requirements of said act, no such scientific survey of the taxable property of the state as is contemplated by said act has or can be made so as to permit of the extension of any valuations arrived at by said Survey Board upon the tax roll of Maricopa County, for the year 1930, and that by reason of the failure to make such scientific first survey as by said act required, said House Bill Number 127 is as to said first survey inoperative,

and the defendant as County Assessor of Maricopa County, Arizona, is under the provisions of chapter 75 of the Revised Code of 1928, required to certify the tax roll containing the valuations found by himself in compliance with said chapter 75, and to file said tax roll containing said valuations with the Clerk of the Board of Supervisors as required by law."

The complaint then states that the property of the state which has been valued by the assessors and not by the board appears on the tax-rolls at approximately forty per cent less in value than the property included in the partial survey as aforesaid, and that the property of plaintiffs and of all persons similarly situated and included in said incomplete survey, was valued at forty per cent more than similar property not so included; and, as a result thereof, they will be required to bear a forty per cent greater proportion of the taxes of the county and state than is equitably their share; and alleges in substance that the only effectual remedy provided for such a situation is the injunctive power of the courts. It then claims that House Bill 127 is unconstitutional for the following reasons: (a) That the act attempts to amend existing laws by reference only; (b) that it embraces two subjects entirely unrelated to each other, and not embraced in the title of the act; (c) that it deprives the taxpayers of the state of their property without due process of law, in that it does not give a hearing to them as to the value of their taxable property; (d) that it does not provide an impartial tribunal to determine the cause of the taxpayer who is unjustly assessed, because the state board of equalization, which is the final authority for reviewing the action of the board of tax survey, is composed of the same members as said board; (e) that it does not provide sufficient time to hear the

causes of the several taxpayers; and (f) that it is repealed by Senate Bill 100 of the Fifth Special Session of the Eighth Legislature, being the act enacting the Revised Code of 1928. To this complaint defendant interposed the following demurrers: (a) To the jurisdiction of the court; (b) that several causes of action are improperly united; (c) that the complaint does not state facts sufficient to constitute a cause of action; and (d) that it does not state facts sufficient to entitle plaintiffs to the equitable relief which they ask. Arthur C. Luhrs and I. E. Brown asked leave to intervene, which petitions were granted, and they adopted the demurrer of defendant; and, the demurrer to the amended complaint being overruled and defendant and interveners standing upon their pleadings, judgment was entered permanently restraining the assessor from amending his tax-rolls in accordance with the orders of the board aforesaid. From this judgment this appeal was taken.

The first question which we consider is the constitutionality of that portion of House Bill 127 involved in this action. If it be unconstitutional, the injunction was obviously correct. If, on the other hand, it be constitutional, it is necessary that we proceed to the other allegations of the complaint.

The power of the legislature over taxation under the Constitution of Arizona is almost plenary. It is limited only by the requirement of uniformity, found in section 1, article 9, of the Constitution, the provisions in regard to exemptions found in section 2, article 9, and the "due process" and "equal protection" provisions of the federal Constitution. *Pacific Fruit Express Co.* v. *City of Yuma,* 32 Ariz. 601, 261 Pac. 49; *Mohave County* v. *Stephens,* 17 Ariz. 165, 149 Pac. 670. Indeed, while plaintiffs presented the various alleged constitutional objections above set

forth, they did not attempt in oral argument to urge seriously any of them. Without taking the time to discuss them seriatim, we are of the opinion that the provisions of House Bill 127 involved herein, at least so far as the objections which have been suggested are concerned, were fully within the power of the legislature to enact. As to its wisdom or propriety, this court, of course, has and can have no opinion. That is a matter for the legislative department of the state, and for it alone, to determine.

But it is urged (and this is the real issue in the case) that the board utterly failed to comply with the provisions of the bill directing it to make a scientific survey of the property of the state, and that such a survey was a jurisdictional prerequisite to any order whatever under the authority of said bill directing any of the tax assessors of the different counties to alter in any manner the assessment-rolls as made by them under the provisions of chapter 75 of the Revised Code of 1928.

On examining section 1, *supra,* of the bill, it appears that the first and principal duty imposed thereby upon the board was as follows: "To institute a scientific survey of all taxable property and classes of property throughout the State. . . . "

The word "survey" is defined as follows: "To examine with reference to condition, situation, value, etc.; to examine and ascertain the state of; as, to *survey* a building to estimate its value, etc.; to *survey* a manor for its extent, value, ownership, liabilities," etc. Webster's New International Dictionary, 1925 ed., p. 2087.

The word "scientific" means: "Agreeing with, or depending on, the rules or principles of science; as, a *scientific* classification." Webster's New International Dictionary, 1925 ed., p. 1895.

And "science" is: "Accumulated and accepted knowledge which has been systematized." Webster's New International Dictionary, 1925 ed., p. 1894.

The "scientific survey" referred to, therefore logically means an examination of the condition, situation and value of something, based upon a systematic knowledge thereof, as distinct from mere idle guesses or imaginary estimates. What is it that is to be thus surveyed? The act names it as "all taxable property and classes of property throughout the State." It therefore appears that the duty of the board was to examine with reference to condition, situation and value, and, based upon systematized knowledge thereof, all of the property of the state without any exception. This view is confirmed by the purpose of the act as stated in the same section, to wit: "(a) Placing upon the tax rolls in every county of the State, all property of every kind and character, subject to taxation under existing provisions of law; (b) extending on the tax rolls in every county of the State with respect to all taxable property and classes of property the valuation for tax purposes as now required by law."

If the purpose of the survey be to place on the tax-rolls all property of every kind and character, it necessarily requires an examination of all property within the state, for in this way only can the board determine that no property subject to taxation will be omitted. In order to be sure that all taxable property has its proper value for taxation, the board must ascertain what that value is. It is obvious that a partial survey will not and cannot accomplish either of the purposes set forth in the act. This "scientific survey" is the first duty of the board, and it is provided by the act that it be completed by the first day of January, 1930, and during each five-year period thereafter.

The second duty imposed on the board is found in section 4, in the following language:

"On or before the first day of May, 1930, the Board shall transmit to the several county assessors of the State, all tax valuations found by it upon specific property or classes of property."

And thereupon it is made the duty of the assessors in each county to "extend upon the assessment rolls the valuations as found and transmitted by the Board of Tax Survey. The valuation so found and transmitted by the Board shall supersede any valuations theretofore found by said assessors or extended upon the assessment rolls."

It is further provided that, in case the board shall find any property subject to taxation is not set forth on the assessment-roll of the county, it shall transmit a description of such property to the assessor, and he shall include it upon the assessment-roll "as described by the Board and at the valuation fixed by the Board." We are of the opinion that the explicit language of the act, its specifically stated purpose, and the various things required to be done therein, lead inevitably to the conclusion that, before the board of tax survey has jurisdiction to transmit to the various assessors any tax valuations or description of property whatever under section 4 of the act, it must first have completed a "scientific survey of all taxable property and classes of property throughout the state," within the definition above set forth. Any other conclusion would defeat the entire intent of the legislature, which is obviously to provide for a complete revaluation and equalization of all the property of the state in conformity with the judgment of the board. This, of course, does not require that such survey shall be complete and exact to a mathematical certainty. A survey or assessment of that character probably never has been

made, and never could be made, by human action, and the law does not require an impossibility. But it does mean that there must be a *bona fide* effort to include in such survey all of the property of the state, and a reasonably complete success therein.

Nor does it necessarily mean that the board in determining the value of any specific property or classes of property or in ascertaining whether any particular property is subject to taxation or is upon the assessment-roll is confined to any particular method. Sections 3 and 6 of the act are extremely broad, and permit physical examination of the property, testimony of witnesses, statements by the owners, production of documents, and indeed, practically any and all methods which would throw light on the subject. So long as its final determination is based upon some systematized rule or scientific principle of classification and made in a reasonable manner, it is sufficient. More than this is not required. Less is not sufficient. If this be the duty of the board, does the complaint set up sufficiently that such duty was not complied with?

We are of the opinion that it does. The allegation that the board did not make a scientific survey of all the taxable property of the state, and made no attempt to value any of the property of producing mines, railroads, public service corporations or personal property, nor of any improvements made on lands after the assessment-roll of 1929 was prepared and completed, certainly on its face negatives the idea of a scientific survey within the definition given by us.

But it is claimed that, even admitting the order of the board directing the extension of the valuations made by it on the tax-rolls of Maricopa county was based on a survey not made in accordance with law, plaintiffs are not entitled to injunctive relief be-

cause they have a complete remedy set forth in the statute itself, to wit, appeal first to the county board of equalization; second, to the state board; and finally to the courts. If the action of the board complained of consisted merely of an erroneous judgment on its part as to the value of plaintiffs' property, either of itself or as compared with other property in the state, the contention would be well founded, for it is well settled that in such a case the statutory remedy must be pursued. The complaint, however, is not based on the theory that the board acted erroneously, but that it acted without jurisdiction—not that it was mistaken in its judgment as to the valuations transmitted by it to defendant, but that under the circumstances set forth in the complaint it had no jurisdiction to transmit any valuations; in other words, that the order of the board was not merely erroneous or voidable, but was absolutely void. It is the general rule of law that injunction may issue against an attempt to enforce a void assessment where an appeal is the only remedy as against an erroneous one. *State* v. *Cull,* 32 Ariz. 532, 260 Pac. 1023; *Fargo* v. *Hart,* 193 U. S. 490, 48 L. Ed. 761, 24 Sup. Ct. Rep. 498; *Schaeffer* v. *Ardery,* 241 Ill. 27, 89 N. E. 294; *Briscoe* v. *McMillan,* 117 Tenn. 115, 100 S. W. 111; *Hart* v. *Smith,* 159 Ind. 182, 95 Am. St. Rep. 280, 58 L. R. A. 949, 64 N. E. 661; *Poe* v. *Howell,* (N. M.) 67 Pac. 62.

This is particularly true when a refusal to issue the injunction would result in a multiplicity of suits. *State* v. *Cull, supra; Singer Mfg. Co.* v. *Adam,* (C. C. A.) 165 Fed. 877; *Sanford* v. *Poe,* (C. C. A.) 69 Fed. 546, 60 L. R. A. 641.

It appears from the complaint there are many thousand taxpayers within the county of Maricopa who are affected by the order of the board, and that, if their only remedy was through the boards of

equalization and the courts by the usual process of appeal, it would be practically impossible to hear their complaints within a reasonable time, or indeed at all.

It was suggested, though, that the board itself was an indispensable party to the action, and that, since it was not brought in and did not intervene, the trial court was without authority to render a judgment in the case. Parties to an action are divided into three classes: Proper, necessary and indispensable. The difference between these three classes is well defined in the case of *Williams* v. *Bankhead,* 19 Wall. (86 U. S.) 563, 571, 22 L. Ed. 184. In that case the court says:

"The true distinction appears to be as follows: First. Where a person will be directly affected by a decree, he is an indispensable party, unless the parties are too numerous to be brought before the court, when the case is subject to a special rule. Second. Where a person is interested in the controversy, but will not be directly affected by a decree made in his absence, he is not an indispensable party, but he should be made a party if possible, and the court will not proceed to a decree without him if he can be reached. Third. Where he is not interested in the controversy between the immediate litigants, but has an interest in the subject-matter which may be conveniently settled in the suit, and thereby prevent further litigation, he may be a party or not, at the option of the complainant."

Under our Code, the objection that there is a nonjoinder of necessary parties must be taken by demurrer or answer, and, if not so taken, it is deemed to be waived. Section 3777, Rev. Code 1928. It is only when the parties are indispensable that the question may be raised in the appellate court. Was the board an indispensable party in this action?

We think that a fair test is whether or not the judgment rendered herein would be *res adjudicata*

as against the board in any action brought by or against it and involving any of the issues of this case. It is obvious that in no sense is the judgment rendered herein binding upon the board. It affects defendant Oglesby and him alone. If, for example, the board should for any reason bring an action of *mandamus* to compel him to place upon the rolls the property included in the list certified by it, it would have a right to have relitigated every issue of law and fact presented in this suit. Of course, it might well be that this court would, as a matter of *stare decisis,* follow the principles of law laid down in the present case; but it would not be bound to do so under the doctrine of *res adjudicata.* In our opinion, it would have been much better had the board been made a party or had it intervened of its own motion. The result of the failure to do this is to compel us in effect to determine whether or not a state board has performed its plain duty imposed on it by law, not on an issue of fact with evidence presented, but on the allegations of a complaint and demurrer to which the board is not even a party. It seems to us that a desire to have this case determined on the real facts would have suggested the propriety of the board's being made a party. This court, however, can consider only the record that is before it and the law applicable thereto; and on such record we are of the opinion that, since the board was not an indispensable, but merely a necessary party, and since the question was not raised before the trial court in any manner, we cannot consider it on appeal. It therefore follows that the judgment of the superior court must necessarily be affirmed.

We might legally decline to go further in expressing any opinion as to future matters, which may arise as a result of our decision, but for reasons set

forth in the beginning of this opinion we shall notice two propositions raised in the oral argument, but not absolutely necessary to a determination of the legal question which is directly before us, which is whether the demurrer was properly overruled, and the correct judgment rendered on the pleadings. It is contended by intervener that, in case the action of the board was illegal, there is no legal assessment-roll for the county of Maricopa, or indeed for any other county of the state, now in existence for the year 1930. This argument is based on the theory that House Bill 127 deprives the various assessors of authority to make an assessment except as instructed by the board. We cannot agree with this contention. The whole bill clearly implies that there is and can be but one legal assessment-roll in a county, and that is the one prepared by the assessor in the first place under the general provisions of chapter 75 of the Revised Code of 1928. This roll, as it is transmitted to and acted on by the board of supervisors, may be the result of the independent investigations of the assessor, or suggestions and information given him by third parties, or of a legal order of the board of tax survey, or the state tax commission, or of all three; but the final result itself, however reached, is the assessment-roll of the county assessor, and it is valid as certified by him until it is changed in some legal manner. All the powers and duties of the assessors and of the state tax commission, as provided in the Revised Code of 1928, are of full force and effect until and as modified by a legal order of the board superseding them.

It was further suggested that, in case the judgment of the trial court was sustained, we would be placed in the anomalous situation of having some counties wherein the order of the board had been followed and others where it had not, thus resulting in an utterly

unequal and unfair assessment of the state.. Were this true, it would not justify this court in departing from the correct rule of law merely for the sake of expediency. But, even admitting such a situation to exist, there is a plain, speedy and far more adequate remedy than we could possibly supply, available. Part of the powers of the state tax commission are set forth in section 3061, Revised Code of 1928, as follows:

"The commission or its agents may enter upon, examine and appraise any and all properties within this state. It may require any county board of equalization, at any time after its adjournment, to reconvene and make such orders as it shall direct, may order such board to raise or lower the valuation of any property of any person, or the valuation of any class of property, and may order or direct such board or any assessor to value property, or classes of property in such way as to the commission may seem just and necessary, to the end that all property shall be valued and assessed equitably and at its full cash value."

The same commission, sitting as a board of equalization, is given the following powers:

"The state tax commission is hereby created a state board of equalization, with full power to equalize the valuation and assessment of property throughout the state; and to equalize the assessment of all property between persons of the same assessment district; between cities and towns of the same county, and between the different counties of the state, and the property assessed by the commission in the first instance." Section 3063, Rev. Code 1928.

We must presume that, if as a result of the peculiar situation which has arisen the rolls of the several counties as returned by the various county assessors and as finally adjusted by the county boards of equalization do result in an unequal assessment of any specific property or class of property, or an omission

of any property which should appear on the rolls, the tax commission and the board of equalization will do their duty. They certainly have ample powers in the premises.

It is ordered that the judgment of the superior court of Maricopa county be, and it is hereby, affirmed.

McALISTER, J., Specially Concurring.—I concur in the opinion of Chief Justice LOCKWOOD. It is very plain from the language of House Bill 127 that it was enacted to procure a scientific survey not of a part only but of "*all* taxable property and classes of property throughout the State" for the purpose of placing such property upon the tax-rolls at the proper valuation, and it is equally plain from the allegations of the complaint, which are not merely undenied but for the purpose of this case admitted as true, that such a survey has not been made. It appears from the complaint that in the survey made there was no attempt whatever to survey or value property throughout the state valued at several hundred millions of dollars or of property in Maricopa county valued at more than thirty-two millions of dollars, and if this be true (and it must be accepted as such under the rules of pleading), it is clear that the very thing the legislature had in mind and directed to be done when it enacted the law has not been carried out and that nothing short of a substantially complete survey of all the property of the state, regardless of its kind or character, would be a compliance with this mandate. If the members of the legislature had thought when voting for the act that they were providing for something less than this it is safe to say that it would have found little, if any, support among them.

The tax commission assesses certain classes of property in the state and it is claimed this constitutes a

yearly survey of this particular property and renders unnecessary a resurvey thereof by the tax survey board. This being true it is argued that it was intended that only that portion of the property which is valued by the fourteen assessors of the state, and not that which the tax commission values, should be surveyed and valued by the board. I am unable, however, to see wherein language so all inclusive as that used in this act—"all the property of the state of every kind and character"—can be construed in such a way as to authorize a survey of only forty or fifty per cent of the property in the state. If such had been the intention of the act it would undoubtedly have excepted from the broad term—all the taxable property of the state—this particular property.

ROSS, J.—The importance of the questions we are considering, involving as they do the revenues of the state and its different political subdivisions, is my excuse, if any be needed, for setting down my views of the law.

To begin with, we are confronted with the very unusual and extraordinary situation of being asked to pass upon the legality of the official acts of the survey board without such board being made a party. Boards or officers exercising the power of placing valuations upon property for taxation purposes are universally held to be acting judicially, and their acts are not subject to collateral attack except for fraud or want of jurisdiction or the adoption of a fundamentally wrong principle or method, the application of which substantially injures the complainant. No fraud is alleged, and it cannot be contended that the board acted without jurisdiction or that plaintiffs will be injured by the method adopted. This board must have kept records of its proceedings. Section 3 of the act (Laws 1929, chap. 46) of its creation requires it to meet and consider the survey being made at least

every sixty days during its progress. The last sentence thereof reads:

"The deliberations of the Board and the information secured in connection with the survey shall not constitute a public record, but shall remain in the private files of the Board until the results of said survey shall be communicated to the several county assessors of the State as hereinafter provided."

The recorded deliberations and the evidence and sources of information acted upon by the survey board are the best evidence of what the board did.

The survey board is a state institution. Its acts affect the entire property of the state. The state and all the property owners therein are interested in what the board did. In the argument it was admitted that the board had transmitted to the assessors of the fourteen counties of the state the results of its labors to be extended on the county assessment-rolls; that all of the assessors, except those of Maricopa and Coconino counties and perhaps one other, had made the extensions. If the board had been made a party to this suit and the survey made by it presented to the court, we would not only have a judgment on the merits of the controversy but one binding on the state and all of its political subdivisions. As it is, the trial never reached the merits, but the case was decided upon an admission by defendant Oglesby and the interveners that all the charges made by plaintiffs against the board and its acts were true. One question is, Should such admissions by strangers to the board's record prevail over the presumption of law that assessing officers have in good faith performed such duties?

In *Bunten* v. *Rock Springs Grazing Assn.*, 29 Wyo. 461, 215 Pac. 244, 249, the court said:

"In *Pingree Nat. Bank* v. *Weber County*, 54 Utah 599, 183 Pac. 334, the court held that proof as to the value of the property is absolutely immaterial in the

absence of evidence tending to show fraud, and an allegation of value in the pleadings would no doubt be treated likewise. To the same effect is *Pittsburg etc. Ry. Co. v. Bachus,* 154 U. S. 421, 38 L. Ed. 1031, 14 Sup. Ct. Rep. 1114.''

In *Missouri ex rel. Hill v. Dockery,* 191 U. S. 170, 63 L. R. A. 571, 48 L. Ed. 134, 24 Sup. Ct. Rep. 53, it was held that the judgment of the board of equalization would not be revised on strength of allegation of undervaluation or mere use of unsupported term "fraudulent." See, also, *Kansas City etc. R. R. Co. v. King,* 120 Fed. 614, 621, 57 C. C. A. 278; *State v. Western Union Telegraph Co.,* 96 Minn. 15, 104 N. W. 567, 568; *State v. Savage,* 65 Neb. 771, 191 N. W. 716, 730; 3 Cooley on Taxation, 4th ed., § 1073.

It was also stated by counsel on the argument that the survey board was personally notified of the pendency of the suit and invited to intervene. For what mysterious reason the board should have chosen to be a mere onlooker or observer, rather than an active participant and a defender of its actions is beyond my comprehension. I think it should have been forced to appear and itself either admit it made no survey or by answer present to the court what it had done, and thereby obtain a judgment on the merits of the case. With only the present parties before us, any decision reached will not be *res judicata* or *stare decisis* as to the state or any of its political subdivisions, except, perhaps, Maricopa county, and not as to it if in any proper proceeding with the board of survey as a party it be shown the survey made complied with the law. Perhaps under the technical rules as laid down concerning who are proper and who are necessary and who are indispensable parties the board of survey was not of the latter kind. But no general rule fits all facts and situations, and, when a state of facts presents itself, and the application of the general rule will secure only a

partial and inadequate relief, or no relief, I conceive it to be the duty of the courts to engraft on the general rule an exception and thereby secure full and complete relief. I think the board of survey was an indispensable party.

Without intimating the existence of collusion in this case, if such a proceeding is allowed, the opportunity for parties dissatisfied with the result of the board's action to so form the issues as to defeat or set aside such result, however just or proper or complete, would be open and might be tempting. Where the acts of officers are of public concern, as here, I think neither the neglect of such officers to intervene nor the failure of plaintiffs to make them parties should be permitted to militate against the interests of the general public.

"Board of tax survey" is only another name given to the state tax commission. Although House Bill 127 purports to create a new creature and to endow it with independent duties, in fact the three officers constituting this board, acting as a state tax commission under the existing laws (chapter 75, Rev. Code 1928), could do all that House Bill 127 makes it their duty to do as a survey board. The truth is that the legislature knew the tax commission, while empowered to supervise the listing and valuation of all the property of the state and its political subdivisions for the purposes of taxation, was not supplied with sufficient funds to employ necessary help, and, accordingly, to compensate the members of the tax commission for increased labors, provided for them salaries of $1,500 per year each under the name of board of tax survey, and appropriated $30,000 for its use in doing the things it was empowered to do as a tax commission, but which it could not do without additional field and office force. The law creating the tax commission provides as follows:

"The commission shall have and exercise general supervision over the administration of the assessment and tax laws of the state, over city, town, and county assessors, and all local boards of levy and assessments, to the end that all assessments of property be made at its full cash value; and require assessors and county boards of equalization to assess all property at its full cash value. . . .

"The commission or its agents may enter upon, examine and appraise any and all properties within this state. It may require any county board of equalization, at any time after its adjournment, to reconvene and make such orders as it shall direct, may order such board to raise or lower the valuation of any property of any person, or the valuation of any class of property, and may order or direct such board or any assessor to value property, or classes of property in such way as to the commission may seem just and necessary, to the end that all property shall be valued and assessed equitably and at its full cash value." Section 3061, chap. 75, Rev. Code 1928.

The duties and powers here conferred on the tax commission extend to all kinds of property and all assessing and equalizing officers of the counties and other political subdivisions of the state, to the end that all such property shall be valued and assessed at its full cash value.

This same body, sitting as an equalization board in August of each year, is required to "examine and compare the abstracts of the assessment of the property in the several counties, and equalize the same, so that all taxable property shall be assessed at its full cash value, subject to the following rules: If it believes that the aggregate valuation of any class of property of any county should be raised or reduced, without raising or reducing other classes of such county, or without raising or reducing it in the same ratio, it may add to or take from the aggregate valuation of any such class such per cent as it believes will raise or reduce the same to the full cash value

thereof; if it believes that the aggregate valuation of any class of property of any city or town, in any county, or of any class of property of any county, not in cities or towns, should be raised or reduced, without raising or reducing other classes of property of such county, or without raising or reducing them in the same ratio, it may add to or take from the aggregate valuation of any class of property of such cities or towns, or any class of property not in cities or towns, such per cent as it believes will raise or reduce the same to the full cash value thereof. The board may require any county board of supervisors, or clerk thereof, to furnish statements showing the assessment of the property of any person within the county. It shall consider and equalize such assessments and, after hearing, may increase the assessment of any person above the amount returned by the county board of equalization, when said assessment shall appear to be too low, first giving notice by registered letter to such person of its intentions so to do, and of the time and place of hearing." Section 3063, Rev. Code 1928.

Thus it may raise or reduce the aggregate valuation of any class of property without raising or reducing any other class of property, and may, after hearing, increase individual assessments.

If these officers acting as a survey board have come into possession of evidence that the valuations of the property of plaintiffs and others similarly situated should be increased, they may exercise their powers as a tax commission or equalization board and cause them to be increased. This it may do whether the assessors have extended on the assessment-rolls the valuations transmitted to them by the survey board or retained thereon the property and valuations as made by themselves. Whether it be the one or the other, this body acting as a tax commission or equalization board may change the valuations so as to attain uniformity.

As a matter of fact, whatever decision may be arrived at in the present case, the officers constituting the tax commission and state board of equalization may correct any inequalities in valuations by raising or lowering the valuations found upon the assessment-rolls of the different counties of the state. Possessing this power, as they do, they can eliminate from the tax-rolls any confusion that may have arisen by reason of this lawsuit.

I do not believe we should, without a knowledge of what the survey board actually did in the performance of its duties, undertake to define what House Bill 127 demands of it in order that its action square with the law. I think with a knowledge of what was done by the board we could well determine whether the survey made by them complied with the spirit of the law. Any definition under the present circumstances is purely abstract. There is no occasion for our determining the meaning of the act until a state of facts is presented showing an effort or failure to comply therewith. I think House Bill 127 leaves the details as to how the survey should be made to the discretion of the board. It does not require the board to adopt any particular method of procedure. This is evidenced by the statement therein (section 2, Laws 1929, chap. 46) that "the procedure established for the survey to be completed January 1st, 1930, shall govern subsequent surveys. . . . "

The board does not have to examine the property in order to survey it. The act (section 6) says:

"The board in its discretion shall have the right . . . to examine all property subject to taxation in the State. . . . "

To my mind, the state tax commission was chosen by the legislature to make this survey because it was in possession of the tax records since statehood, was familiar with the property of the state, its location, kind and value, and had personal and official knowl-

edge of properties that had grown in value as well as those that had not increased or that had depreciated; that it was the intention of the act that such officers should supplement and verify such knowledge as they already had only in those instances where they felt it was necessary to cut out inequalities heretofore well known to exist.

The general revenue laws (chap. 75, Rev. Code 1928) and House Bill 127 are not independent of each other. The latter would be meaningless or destructive of our taxing system if not tied into the general laws governing taxation and construed as a part thereof. It was intended to supplement the tax laws as then existing.

With the record we have before us, I do not think we are sufficiently advised to pass upon the merits, and I therefore decline to enter upon a discussion of that feature of the case. When we have the facts before us, it will be time enough to determine whether the survey board performed its duties as prescribed in House Bill 127. Without the survey board and its records before us, anything we may say is mere *dictum*, binding neither the state nor any of its political subdivisions.